IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

**KEITH E. KIRBY,**

    Plaintiff,

v.                                      Civil Action No. 3:21-cv-00145

**RES-CARE, INC.**, a Kentucky Corporation,

    Defendant.

## DEFENDANT'S MOTION IN LIMINE

Defendant Res-Care, Inc. ("Res-Care") employed Plaintiff Keith Kirby ("Kirby") as a caretaker of adults with severe developmental disabilities living in Res-Care's assisted living residences. Res-Care fired Kirby and a co-employee when it discovered that both had participated in the abuse of a resident, "LS."[1] This abuse was confirmed by video, and the federal Department of Health and Human Services deemed the event an unauthorized physical restraint that violated LS's rights. Kirby, along with the other terminated employee, are seen on video entering LS's room immediately before the improper physical restraint occurred, and then leaving shortly afterwards. The video evidence conclusively proves that these two employees—and only these two employees—were involved in the abuse incident. Both have admitted there is no evidence that any other person was involved.

Kirby contends that, despite this conclusive evidence, he was actually terminated because of complaints he made to a regulatory oversight agency. Kirby couches his claims as ones for retaliatory discharge in violation of substantial public policy and a claim under the Patient Safety Act. Both claims fail as a matter of law because incontrovertible video evidence shows that Kirby

---

[1] Res-Care is referring to the subject resident by her initials to protect her privacy.

was fired for a legitimate, non-discriminatory, and non-pretextual reason. Kirby's proffered retaliatory motive is not supported by evidence sufficient to overcome Res-Care's stated termination reason. Res-Care has moved for summary judgment seeking dismissal of both of Kirby's claims and the Complaint in its entirety. *See generally* ECF Nos. 34–35, 44, & 46–50. Should that motion be granted, this Motion in Limine would be moot.

But in the event Res-Care's summary judgment motion is denied in whole or in part, this Motion in Limine seeks to prevent Plaintiff from introducing evidence irrelevant to Kirby's claims and Res-Care's defenses. Plaintiff has made clear that he intends to present evidence that is wholly irrelevant, unfairly prejudicial, and likely to confuse the jury regarding the issues before it. In sum, lacking any credible evidence of retaliatory intent or action, Kirby seeks to confuse the jury by (1) attempting to smear and vilify Res-Care with allegations of poor care irrelevant to Kirby's claims, and (2) attempting to support his claims with allegations that Kirby himself, in sworn testimony, has disavowed.

In particular, the following are evidentiary topics that Defendant believes Plaintiff will try to introduce at trial. As further explained here, the Court should enter an Order in advance of trial prohibiting Plaintiff from introducing evidence of the following subject matters:

1. LS's death—which occurred *after* the subject improper physical restraint incident for which Plaintiff was fired—in addition to her care, lack of care, or any other issues regarding LS *after* the subject improper physical restraint.
2. All evidence of Kirby's internal complaints within Res-Care, which Plaintiff's own sworn testimony establishes were not a basis of his allegedly wrongful termination.
3. All content in the two OHFLAC and DHHS investigations occurring from October to December 2020, except (a) the specific communications by Plaintiff to each agency upon which Plaintiff pins his complaint of retaliatory discharge, (b) similar communications by other Res-Care employees, and (c) information regarding the subject physical restraint of LS.

I. **Statement of Facts**

Res-Care employed Kirby as a "Direct Service Professional" or "DSP" at its assisted living residences in Huntington. Ex. A[2] (Keith Kirby Dep.) at 12; Ex. B (Brad Story Dep.) at 11. Kirby primarily worked at one particular assisted living residence in Huntington called the Chafin House. Ex. A at 14–15. Chafin House residents were adults with substantial intellectual and developmental disabilities that required 24-hour staffing by DSPs. *Id.* at 13–14; Ex. B at 7–8. As Kirby explained, he and the other DSPs provided "everything from washing, cleaning, cleaning up their room, whatever they needed. It was just like a, it was like a caregiver." *Id.* at 12.

In October of 2020, these DSPs were responsible for care of the Chafin House's eight residents, including LS. A Chafin resident since August 2008, LS had a lengthy list of serious medical conditions. Ex. A at 14, 58. LS required assistance to walk and perform even the basic tasks of eating, dressing, walking, showering, and going to the bathroom. *Id.* at 68 (describing bathing assistance). Among her numerous physical complications, LS was non-verbal and a fall risk who frequently fell, often injuring herself. *Id.* at 22–23, 54, 56, 62. For this reason, she was to wear a helmet for all waking hours, required a gait belt for assistance when walking, and had padding placed in her room. *Id.* at 86, 88.

On October 25, Kirby began the night-shift at 10 p.m. That shift ended at 8 a.m. the following morning. *Id.* at 73. Kirby was working alongside two other DSP's, Sara Horn and Keith Moore. Ex. D (Kimberly Hensley Aff.) at ¶ 3. Kirby contends that Moore was assigned to LS and was responsible for her for the shift. Ex. A at 22 & 38. Moore disputed this, testifying instead that he was only assigned to LS for the first part of the shift, and LS was to be watched by Kirby and/or Horn later in the shift. Ex. E (Keith Moore Dep.) at 23, 34, 36–37.

---

[2] Exhibit references are references to the exhibits submitted in support of Res-Care's Motion for Summary Judgment. Res-Care is not re-submitting these exhibits with this Motion.

During that night, LS got out of bed and was walking throughout the house on multiple occasions, which was not uncommon. The last time LS was up walking and put back to bed, Kirby and Moore both put her back to bed at 6:58 a.m. and then left LS's room at 7:02 a.m. This is confirmed by hallway camera video showing Kirby and Moore leaving LS's room at almost the identical time, with Moore exiting in front of Kirby by no more than 2 to 5 seconds. Ex. A at 119. The critical video segments depicting these events—the entrances and exits at 6:58 a.m. and 7:02 a.m.—were submitted under seal as Exhibits F1 and F2 in support of Res-Care's pending Motion for Summary Judgment.

No one entered LS's room after Kirby and Moore left—until the day shift came on duty at 8 a.m. At that time, DSP Karen Mays entered LS's room at 8:07 a.m. Ex. A at 44, 118–20; Ex. G (Res-Care Investigative Summary) at 3–4. When Mays entered Resident LS's room, she discovered that LS had been wrapped in a blanket "like a burrito" from her shoulders down to her waist. She could not move her arms and was kicking her legs. Pillows surrounded LS's head, and a large bean bag loomed above her that could have fallen on to her face and suffocated her. Ex. G at 3. Distraught by what she had seen, Mays promptly summoned DSP Kathy Lawrence and LPN Tara Duty to LS's room. They witnessed Resident LS in that same condition. *Id.* at 2. Duty took a short (less than 30 seconds) video on her phone to document the manner in which LS was physically restrained. This video was also submitted under seal as Exhibit H in support of Res-Care's pending Motion for Summary Judgment.

On October 26, the day that LS's restraint was discovered, Res-Care started an investigation, conducted by Res-Care investigators Denise Wilks and Cristy Hamilton. Over the course of several days, they interviewed witnesses, reviewed documents and videos, and by

4

November 5, documented their findings in a final Investigative Summary. Ex. G. Significant conclusions reached were:

> 1. Keith [Moore] and Keith Kirby both took client to bed and left together at 7:02 a.m. and no one, including the client, entered LS room until 8:07 a.m. when morning staff went to room to get client up for the day and discovered her restrained in her bed.
>
> 2. Video evidence shows LS was wrapped in a comforter with her arms down, and pillows around her to prevent her from rolling over, a pillow on her chest just below her chin, as well as a large bean bag propped close enough LS was attempting to kick it out of her way.
>
> ***
>
> 4. Due to LS non-verbal status, she would not be able to yell for assistance if any of the pillows or bean bag had fallen on her face.
>
> ***
>
> 6. Both [Keith] Kirby and [Keith] Moore state they left the other in the room with client. Video shows they entered the room and left the room together.

*Id*. at 4.

The restraint in which LS was placed, and then left alone in her room, violated Res-Care policy and presented a risk of serious injury or death to LS. And both Kirby and Moore lied about their involvement and/or awareness of her restrained condition during Res-Care's investigation. For example, Kirby twice denied that was even in LS's room, claiming instead that he only handed LS back to Moore to return her to her room. Ex. G at 2–4. Video evidence showed this purported alibi to be false.

Res-Care's investigation concluded that the allegation of an improper physical restraint was substantiated against both Kirby and Moore. *Id*. Res-Care terminated both Kirby and Moore based upon these findings. Exs. I (Res-Care Investigation Recommendations & Follow-Up), J (Moore's corrective action [termination] record), & K (Kirby's corrective action [termination] record); Ex. B at 33. Kirby's termination was effective November 18, 2020. Ex. D at ¶ 5; Ex. A at

5

139–40. Res-Care's investigation was followed by a subsequent regulatory investigation conducted by the federal Department of Health and Human Services ("DHHS") shortly after Kirby's termination. That DHHS survey also concluded that LS was placed in an "unauthorized, makeshift mechanical restraint" and violated LS's rights under multiple applicable federal regulations. Ex. L (DHHS Investigation) at 4, 9, 27, & 31.

State rules regarding assisted living residences provide that licensees such as Res-Care "shall ensure that no resident is *abused*, exploited, neglected, mistreated, or *restrained by physical* or chemical *means*." W. Va. C.S.R. § 64-14-5.2.2 (emphasis added). Significantly, if an allegation of abuse is substantiated, a licensee like Res-Care "shall assure that appropriate sanctions are invoked, or actions are taken to prevent a reoccurrence of alleged abuse, exportation or neglect." W. Va. C.S.R. § 64-14-5.2.5; *see also* 42 C.F.R. § 483.450(b)(iv)(B) & 483.420(a)(6) (prohibiting improper physical restraints and other physical abuse); W. Va. Code § 9-6-4 (prohibiting abuse) & -9 (mandatory reporting of abuse). Kirby concedes that LS should not have been physically restrained and that doing so violated Res-Care's policies. Ex. A at 28. And Kirby agrees with DHHS's conclusion that LS's restraint was indeed an "unauthorized, makeshift mechanical restraint" that violated multiple rules and regulations. Ex. A at 27–28; *see also id.* at 31–32.

On October 28, 2021, two days after the improper restraint, LS was being supervised while she was crawling on the floor (a normal activity for her). While she was doing so, LS struck her nose on the floor and began bleeding. She was taken the hospital and later released back to Chafin House. No long afterwards, LS apparently fell again and hit her head, leading to a second hospitalization. On November 7, 2020, while hospitalized that second time, LS died, nearly two weeks after the improper restraint at issue here.

## II. Standard of Review

Evidence is irrelevant, and thus inadmissible, if it makes no fact of consequence more or less likely to be true. Fed. R. Evid. 401. Even if evidence passes Rule 401 relevance muster, it can still be inadmissible under Rule 403: "Rule 403 permits exclusion of relevant evidence 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Hovey v. Cook Inc.*, No. 2:13-cv-18900, 2015 U.S. Dist. LEXIS 38205, at *6–7 (S.D. W. Va. Mar. 26, 2015). Evidence is considered to be unfairly prejudicial "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence." *United States v. Van Wart*, 401 F. App'x 794, 798 (4th Cir. 2010). With these legal concepts in mind, Res-Care will now address the specific evidence it asks this court to exclude from evidence.

## III. The Court should exclude irrelevant and unfair prejudicial evidence.

### A. *LS's death and post-restraint care is irrelevant, unfairly prejudicial, and should be excluded pursuant to Rules 401, 402, and 403.*

LS was found in an improper restraint in which Kirby participated (i.e., was directly involved in restraining her or at the very least was aware and allowed it to occur). Days later, and after Kirby's suspension, LS suffered unrelated injuries, was hospitalized twice, and ultimately died. Each of these facts occurred *after* the subject restraint, and have no bearing on or connection to Kirby's claims. As Plaintiff concedes, LS had numerous, serious health conditions. Her cause of death has not, to Res-Care's knowledge, been found by any medical provider to have been caused either by any particular fall or any reason related to her care at the Chafin House. Plaintiff can only speculate and cite hearsay from co-employees as to any reasons underlying LS's death. Ex. A at 155 & 167. Plaintiff's suggestion that LS died as a result of her care while at the Chafin

House is pure speculation. Plaintiff has shown no medical basis to admit any such evidence. In fact, Res-Care is aware of no medical evidence that any falls preceding LS's death are any more causally related to her death than the improper physical restraint in question, which also occurred in this same general time frame. Permitting Kirby to argue or even imply that these fall events caused LS's death is no more supported by medical evidence than an argument by Res-Care that the improper physical restraint in which Kirby was involved caused her death. For this foundational evidentiary reason alone, any such evidence should be excluded.

But even if LS's cause of death was not speculation (and it is), LS's death still has absolutely nothing to do with Kirby's retaliatory discharge claims. The two regulatory agency audits in this general time frame prove this irrelevance. First, the OHFLAC investigation and survey was completed by October 22—more than two weeks *before* LS's death. In short, Kirby could not have possible spoken to OHFLAC regarding any alleged falls "causing" LS's death. The OHFLAC investigation was complete before her subsequent injuries or death. The second DHHS investigation similarly fails to connect LS's death, Res-Care's care, and Kirby's termination. While that investigation was completed on December 2, after LS's death, DHHS draws no causal conclusions between any falls and LS's death. And that investigation wasn't completed until two weeks *after* Kirby's termination. So the content of that survey could not possibly serve as a retaliatory basis for his termination. Ex. L at 19–20.

Kirby wants the jury to learn of LS's death for a simple reason: This fact could inflame the jury and prejudice it against Res-Care. The jury may be tempted to hold Res-Care accountable or LS's death and punish Res-Care accordingly—to Kirby's benefit on unrelated claims. But this is not a wrongful death suit. This is a wrongful termination lawsuit. LS's death has no probative value toward any material fact in question and, as such, it is irrelevant to this suit. Even if there

were some minimal probative value or relevance, that is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. Accordingly, Rules 401, 402 and 403 all support excluding any evidence, argument, or reference to LS's death. The same is true for her care or for any falls leading up to LS's death that occurred days *after* the subject restraint. All such evidence should be excluded from this trial.

B. ***Kirby himself testified that he was fired for his cooperation with OHFLAC investigations, not his internal complaints. As such, they should be excluded.***

Kirby's Complaint alleges that he was fired both for (1) internal complaints to Res-Care and (2) communications to a governmental regulatory agency, OHFLAC.[3] But Kirby's deposition testimony revealed that only the latter claim, and evidence in support of it, should be presented at trial. The following exchange took place during Kirby's deposition.

> Q. As between whatever communications, and reporting, and complaints . . . that you are making to your employer on the one hand and as to your communications and reporting that you are making to OHFLAC, do you believe that one of those was a bigger reason why Res-Care fired you than the other?
>
> [Plaintiff's counsel's objection, but permitting Kirby to answer "if you're able"]
>
> A. ***It was OHFLAC.*** The complaints that we was -- ***and it just wasn't me complaining. It was everybody complaining*** about not having this and not having that. That's what we do when it comes to caring for the people. We was in there. If we needed something, that's the only way to get something. That had nothing to do with it. The biggest issue was they suspended me and gave me disciplinary action for a client that wasn't even mine. Then, when they found out -- then, when that happened to [LS] on that Friday, and then they found out I was talking to OHFLAC . . . .
>
> ***
>
> Q. But your belief is after you been -- your -- as I understand it, ***your belief is, after you've been cleared in the initial investigation, you then were communicating with OHFLAC and you think that's the reason they fired you?***
>
> A. ***Oh, definitely.***

Ex. A at 171–74 (emphasis added).

---

[3] As explained herein, there were actually two regulatory audits over the general time frame involved, one by OHFLAC and one by DHHS. Res-Care gives Plaintiff the benefit of the doubt that he is referring to both of these agencies and audits, as the surveys themselves indicate that is the case.

9

Thus, not once—but twice—Kirby himself rejected any notion that internal complaints within Res-Care were a basis for his termination.

A plaintiff may not disavow his or her sworn testimony and instead rely upon unsworn allegations. *See Pizzuto v. Smith*, 2014 U.S. Dist. LEXIS 70271, at *9 (N.D. W. Va. May 22, 2014) (granting defendant summary judgment based in part upon plaintiff's admissions made in deposition); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.").[4]

And while Kirby's counsel attempted to rehabilitate the damaging testimony with leading questions of his own, this too is insufficient to create a genuine issue of material fact. "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Workman v. UA Theatre Circuit, Inc.*, 84 F. Supp. 2d 790, 793 (S.D. W. Va. 2000) (granting summary judgment when plaintiff attempted to create a question of fact based on her own self-serving deposition cross-examination, contradicting a key concession offered in direct examination) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)).

In the end, Kirby's testimony was plainly revealing. Even he does not believe that any internal complaints to Res-Care were a basis of his termination decision, and thus no rational trier

---

[4] Even post-deposition, conflicting affidavit testimony is generally insufficient to create a genuine issue of material fact. *See, e.g.*, *Horton v. Family Dollar Stores of W. Va., Inc.*, No. 2:16-cv-05361, 2017 U.S. Dist. LEXIS 80962, *13 (S.D. W. Va. May, 26, 2017) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." (quoting *Alba v. Merrill Lynch & Co.*, 198 Fed. App'x 288, 300 (4th Cir. 2006)).

of fact could conclude so either. As a result, evidence and argument regarding any internal complaints to Res-Care by Kirby should be excluded from this trial. If the Court were to allow testimony regarding Kirby's internal complaints, then evidence related to the care and conditions at Res-Care should be limited to only the specific matters Kirby or other employee witnesses testify they complained to Res-Care about. To the extent Kirby seeks to testify about or elicit testimony from other witnesses concerning poor care or conditions, Kirby should not be permitted to turn his trial into a referendum on Res-Care's quality of care or performance in lieu of focusing on his retaliatory discharge claim. Such matters are wholly irrelevant to his claim of retaliation and should be excluded.

### C. *OHFLAC and DHHS investigations should be redacted of irrelevant information that has no connection to this case.*

Either or both parties may seek to introduce evidence regarding the OHFLAC and DHHS investigations and surveys. Certain information in those surveys is relevant. For example, Plaintiff relies upon his communications to OHFLAC (and perhaps DHHS) as the basis of his alleged retaliatory discharge. As such, the substance of Kirby's communications to the agencies would be relevant. The same would be true for other Res-Care employees making similar communications to both OHFLAC and DHHS. Those statements are important to Res-Care's defense that other employees cooperating with the agencies were not terminated, thus disproving Kirby's pretext theory. Finally, the DHHS survey contains information specifically about the subject physical restraint of LS as well as DHHS's conclusion that it was an improper mechanical restraint. This, again, support's Res-Care's defense and disproves Kirby's pretext theory.

However, the referenced OHFLAC and DHHS surveys have other information regarding the care of LS and other residents that is wholly irrelevant to this case. Res-Care is concerned that Kirby may use these other, unrelated portions to generally attack or smear on other, unrelated

bases. Such broadsides, of course, would be irrelevant, unfairly prejudicial, and inadmissible. Accordingly, to the extent that any party uses the OHFLAC or DHHR reports at trial, they should be redacted to omit all substance except matters directly related to (a) Kirby's complaints to the agencies, (b) other Res-Care employees' complaints, or (c) facts regarding LS's restraint. Any conduct or findings by OHFLAC or DHHR beyond these matters are irrelevant to Kirby's claims and could be unfairly prejudicial to Res-Care. The content in these surveys other than as outlined above, should be redacted and excluded from evidence and argument. Res-Care-, of course, is willing to negotiate the specific redactions with opposing counsel ahead of trial.

## IV. Conclusion

For the reasons set forth above, the Court should issue an order ahead of trial:

1. Excluding all evidence, argument, or reference of LS's death—which occurred after the subject improper physical restraint incident for which Plaintiff was fired—in addition to her care, lack of care, or any other issues regarding LS *after* the subject improper physical restraint.

2. Excluding all evidence, argument, or reference of Kirby's internal complaints to Res-Care, which Plaintiff's own sworn testimony establishes were not a basis of his allegedly wrongful termination.

3. Excluding evidence, argument, or reference to all content in the two OHFLAC and DHHS investigations occurring from October to December 2020, except (a) the specific communications by Plaintiff to each agency upon which Plaintiff relies for his complaint of retaliatory discharge, (b) similar communications by other Res-Care employees, and (c) information regarding the subject physical restraint of LS. This would involve appropriate redactions of the subject documents.

**RES-CARE, INC.,**

By counsel,

*/s/ J. David Fenwick*
R. Booth Goodwin II (W. Va. Bar No. 7165)
J. David Fenwick (W. Va. Bar No. 6029)
Lucas R. White (W. Va. Bar No. 12501)
GOODWIN & GOODWIN LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
T: (304) 346-7000
F: (304) 344-9692
rbg@goodwingoodwin.com
jdf@goodwingoodwin.com
lrw@goodwingoodwin.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# AT HUNTINGTON

**KEITH E. KIRBY,**

    Plaintiff,

v.                                                                      Civil Action No. 3:21-cv-00145

**RES-CARE, INC.**, a Kentucky Corporation,

    Defendant.

## CERTIFICATE OF SERVICE

I, J. David Fenwick, hereby certify that a true and correct copy of the foregoing **Defendant's Motion in Limine** was served upon the following counsel of record on January 13, 2022 via the Court's CM/ECF system.

Mark A. Atkinson
ATKINSON & POLAK, PLLC
P.O. Box 549
Charleston, WV 25322-0549
*Counsel for Plaintiff*

                                                 */s/ J. David Fenwick*
                                                 J. David Fenwick (W. Va. Bar No. 6029)